HARPER S. CUNNINGHAM, *Receiver*, v. THE UNITED STATES NATIONAL BANK, *et al.*

(Filed November 8, 1897.)

1. TRUST ESTATE—*Administration of—Judge and Receiver Interested Parties.* Evidence examined and held sufficient to show that both the receiver and the judge who appointed him sustained such relations to the insolvent bank and its president, at the time of such appointment, as to be interested in the administration of the trust estate, and therefore improper persons to supervise the settlement and distribution of same.

2. RECEIVERS—*Compensation of—Expenditures—When Proper Charges Against Trust Estate.* Receivers of insolvent institutions should only be allowed adequate compensation for the amount and character of the services performed by them for the trust estates placed in their charge, and useless and extravagant expenditures made by them should be disallowed.

(Syllabus by the Court.)

*Error from the District Court of Logan County; before John H. Burford, District Judge.*

*S. L. Overstreet,* for plaintiff in error.

*Horace Speed,* for defendant in error.

Opinion of the court by ·

KEATON, J.: Owing to the peculiar complications which have arisen in this case, caused somewhat by the matter contained in the dissenting opinion filed herein by Mr. Justice Tarsney; which said opinion is sought to be made a part of plaintiff in error's original application and motion for rehearing by the tenth assignment contained therein, which is as follows: "We have examined the dissenting opinion in this case of the Hon. Judge Tarsney filed this day, and regard it as a correct declaration of the law, showing a careful examination of the record and the law and, by reference thereto, hereby incorporate it in this petition as conclusive grounds for the granting of a rehearing and a reversal of the decision of the court below, and earnestly invite a careful and candid consideration of the unanswerable arguments therein contained." It has been determined by a majority of the members of this court that the situation is such as to demand that we go further than is usually customary in passing upon a petition or application for a rehearing and hand down a written opinion thereon especially covering the principal points of difference between the original majority opinion of this court and the dissenting opinion as to what the evidence contained in the record discloses the facts to be concerning certain material propositions involved in the case.

The difficult task of preparing such an opinion has been assigned to me and, after a thorough examination and re-examination of the evidence contained in the record, I desire to state at the outset that, in my judgment, the disagreement upon said propositions, between the writers of the two former opinions filed herein, arises

more largely from the difference in the deductions drawn by them from the evidence contained in the record than from a difference of opinion as to what said evidence actually is. Hence, I have concluded that the best, if not the only, way to properly settle and determine the controversies thus presented and finally dispose of this cause, is to set out *in haec verba* considerable portions of the testimony bearing upon the said disputed propositions, even at the risk of making this opinion cumbersomely prolix.

As I am convinced, after a careful re-examination of the evidence contained in the record, that the former conclusions reached by the majority of this court in the original opinion filed herein should, in all things, be sustained, and as one of the principal and most vigorous assaults made upon said opinion, both in the dissenting opinion and the original and amended applications for a rehearing of this cause, is, in substance, that the finding and conclusion of the writer of said majority opinion— to the effect that Judge E. B. Green, who appointed the receiver, the approval of whose accounts is the subject of this entire controversy, sustained such relations to the defendants, the National Bank of Guthrie and L. De-Steiguer, as to render him, in fact, an interested party in the administration of the trust estate—are wholly unsupported by the evidence under the law applicable thereto, I shall first quote certain portions of the testimony bearing upon this proposition and then give what I conceive to be the legitimate and natural conclusions to be drawn therefrom. In order that there may be no possible room for mistake or disagreement as to whether or not the testimony set out in this opinion is correctly quoted, I shall cite the page or pages from which each particular

portion thereof so quoted is taken; and upon the proposition now under consideration I find the evidence to be in part as follows:

Testimony of H. S. Cunningham, the receiver:

"Question. Now I will ask you if at the thime that bank went into the hands of a receiver, after the order of the court was made, there was not $550, or about that, of the bank assets, taken, with your knowledge, by De-Steiguer and given to Judge Green, and his note taken for $1,600, including this $550 or such an amount, and given by DeSteiguer to you, and without any objections upon your part to such use of the bank funds? Answer. No, sir; that is not true.

"Q. What is the truth about that matter? A. I learned of that transaction which you detailed taking place, but that it was done with my knowledge, or my consent, or that any money was removed from the bank with my knowledge and consent, is not true.

"Q. When did you learn of it? A. Not until long afterwards.

"Q. How long afterwards? A. I don't know how long afterwards, but a long time afterwards.

"Q. About how long afterwards, well about the time? A. I think it was first up about the time, I think, of the investigation of Judge Green. * * *

"Q. When were you given that $1,610 note of Judge Green's? A. Well, I was given that note on the 16th of June.

"Q. The 16th of June, 1892? A. Yes sir; I think I had it in the list of assets anyway." (pp. 115-116.) * * *

"Q. If you found out at the time of the investigation the fact that these papers had been turned over, did you find also that Judge Green had received the assets of the bank after the bank had been—after the receivership had been turned over to you? A. Why, I knew of Judge Green borrowing $500.

"Q. $500, or $550? A. $500, as I understood it. I can tell you the circumstances of that, if you want to know.

"Q. What are the circumstances? A. The circumstances are that Judge Green asked me to lend him $500; asked me if I could lend it, asked me if I could lend him $500.

"Q. When did he ask you that? A. Well, I don't know when it was.

"Q. Was it before or after this receivership? A. I think it was after.

"Q. How long after? A. Well, it was about that time.

"Q. On the same day was it, or not? A. No sir, it must have been the next day or two.

"Q. Very well, he asked you to lend him $500? A. Yes sir.

"Q. Then what happened? A. I told him that I could not do it.

"Q. Then what happened? A. But I told him that I would endorse with him, or that I would see if I could not get somebody to lend it to him. I heard that Mr. De-Steiguer was loaning money then, or talking of making a loan to Craig for $1,250, and I asked him if he could not loan Judge Green $500; he said he could.

"Q. He was loaning to whom? A. He was loaning to Dr. Craig; he was negotiating a loan with Dr. Craig.

"Q. DeSteiguer, the president of this bank that had gone into the hands of a receiver? A. No, sir, not the president of the bank but Mr. Louis DeSteiguer.

"Q. Was he not the president of the bank at that time? A. Yes sir, certainly he was, but he was not loaning money for the bank. He was loaning money to Dr. Craig, or discussing the probabilities or possibilities of loaning it, and I supposed at the time that DeSteiguer was rich.

"Q. You didn't suppose that the president of a bank that had just gone into the hands of a receiver was rolling in wealth? A. Yes, sir, I did, I had no doubt about it.

"Q.  And, supposing that, did you ask him, immediately upon assuming the receivership, to make Judge E. B. Green a loan of $500?  A.  Just wait until I tell you about this; I asked him if he could lend him $500, to Judge Green.  Judge Green told me that Joe McNeal had jumped on to him for a $500 loan that he had over there, and I asked DeSteiguer if he could loan Judge Green this money and he said that he could; that was all I knew about it.  The only thing I knew about it, I supposed that the loan was made, and I never knew that this $1,600 represented any portion of this until long afterwards.

"Q.  How long afterwards?  A.  I think it must have been—I can't tell just, but it was a long time afterwards.

"Q.  About how long afterwards?  A.  Well, I cannot tell you.

"Q.  Months?  A.  Yes, sir, I should say months.

"Q.  Then how did you come to learn that it represented part of the assets of the bank?  A.  Well, I don't know how it was brought to my attention now.

"Q.  Tell me who did it, as you recollect now?  A.  I can't tell you how I first knew of it.

"Q.  This $500 did, in fact, belong to the assets of the bank?  A.  I do not know.

"Q.  You understood so?  A.  I have heard since that it did.

"Q.  You understood so?  A.  Well, I think I understood that Mr. DeSteiguer took the money out of the bank.

"Q.  Did Mr. DeSteiguer hand you that $1,610 note of Judge Green's before you asked DeSteiguer to lend that money?  A.  No, sir.

"Q.  Did he hand it to you afterwards?  A.  I think he did.

"Q.  How long afterwards?  A.  Well, I think it was two or three days."  (pp. 117-118-119.) *  *

"Q.  It didn't raise any inquiry in your mind when this note, just signed by the court, was handed to you by De-

Steiguer among the lists of the assets?    A. I didn't notice that it was just signed, and I didn't make any question about it at all.

"Q.    You didn't look at the books to see when that came out?    A.    Why, no, the note was dated I think in —well, it will show for itself—I think it was dated some time in May or April.

"Q.    What was that—it was dated back a month or two?    A.    I don't know, but I think—in fact, from what I know of the transaction since, I am satisfied that it was dated back.

"Q.    A month?    A.    May be more.

"Q.    Have you ever collected that note?    A.    No, sir, I turned it over to Mr. Gray, the receiver."    (pp. 120-121.)    *    *

"Q.    Now, it was after you asked DeSteiguer to do this that he turned in this $1,610 note?    A.    Yes, sir, I am satisfied it was.

"Q.    You have never pressed the payment of that note?    A.    Pressed it on all occasions, every chance that I got, every time I got a chance to talk to Judge Green about it, I insisted upon his paying that note; *that it was detrimental to him every way to let it stand as it was to every body else connected with the institution;* pressed it on all occasions, in season and out of season.

"Q.    You did not, as receiver, make any further attempt to get this money except the conversations with him?    A.    No, sir, I did not understand that it would avail anything.    I did not sue him.

"Q.    After he ceased to be judge, you did not sue him? A.    No, sir.

"Q.    How long after you had asked DeSteiguer to get this money for Judge Green was it before you received this note?    A. Well, if I asked DeSteiguer on the 14th, I received the note on the 16th; if I asked him on the 15th, I still received it on the 16th.    I am certain that I did not ask DeSteiguer the day I was appointed, because the occasion did not arise.    Judge Green had showed me the

note from McNeal, who was a rival candidate for the place, and he insisted on the payment of this $500, and I think that was the morning after I was appointed." (p. 123.)    *    *

"Q.   When did you first ascertain that he got it from this bank?   A.·  I did not understand that he got it from the bank for a long time afterwards.   I understood that he had gotten the money the next day or two days, but I did not understand that he had got it out of the bank until long after that.

"Q.   When was that note made due and payable?   A. I think it was due some time in July."   (p. 134.)    *    *

"Q.   When did you first request or make a request of Judge Green   for payment of this note?   A.   Right at the  time it was due.

"Q.   What did he say about it then?   A.   He said that he would be able to take it up in a few days; that he was going to Chicago, and had negotiated a loan with Mr. Farwell, J. V. Farwell, and he would be able to pay it in a very few days.    *    *

"Q.   Did you ever make any agreement with him to extend the time of payment of this note?   A.   No, sir, I always insisted on having payment every time the matter came up, but I did not make any agreement with him whatever to extend the time.

"Q.   Do you know now that DeSteiguer took the money out of the bank while that matter was pending in · court?   A.   Of my personal knowledge, no, sir.

"Q.   Well, from Mr. DeSteiguer?   A.   Well, I rather think that DeSteiguer admitted to having taken it.   I accused him, and he laughed about it, and I rather took it as an admission that he took the money at that time, when it came out as a reflection upon me and upon Judge Green.   ·

"Q.   Was that after the order of appointment had been made by Judge Green that he signed up this note?   A. Oh, yes, long after that;  that is, it was two days after ·

that. The order was made right after noon on the 13th, before the 14th, probably it was the 15th." (pp. 137-138.) * *

"Q. Now as to the $500 which DeSteiguer loaned to Judge Green, you have testified on examination by Mr. Speed, both as to your knowledge of that, and as to what was said by DeSteiguer and others? A. Yes, sir.

"Q. And I understand you that it was long after this occurrence that you had any suspicion or information that it was taken out of the assets of the bank, if it was? A. I have reflected over that matter in my mind thoroughly and diligently since last night, and I can not recall that I ever knew of that fact until the time Mr. Chalmers was here and examined into Judge Green's matters, and I learned it at that time; I cannot recall any other time that I knew it until that time. * *

"Q. Did you have any knowledge of Judge Green's knowledge of where the $500 came from that DeSteiguer loaned him? A. I have no further knowledge of it except as I have detailed here. I asked Mr. DeSteiguer for the money, if he would let Judge Green have $500, and he said he would. There was no connection in my mind or information that came to me between that $500 and the $1,610 note until long afterwards. I had no knowledge that connected the two transactions until long afterwards, and that information, if I had any on the subject, was simply what somebody told me, and what I heard and understood, and inferred. * *

"Q. I will ask you to examine that note and state if it is the E. B. Green note (handing witness paper)? A. Yes, sir, I think that is the note for $1,610 signed by Judge Green which I received as part of the assets of the National Bank of Guthrie.

"Q. Do you know Judge Green's signature? A. Yes sir.

"Q. Is that it? A. That is his signature.

A copy of note is as follows:

"$1,610.00     GUTHRIE, Oklahoma, May 11, 1892.
"No. 2703.

"On the 11th day of July, 1892, for value received, I promise to pay to the National Bank of Guthrie, or order, at the National Bank of Guthrie, sixteen hundred and ten and no-100 dollars with interest at the rate of eight per cent. per annum after maturity, and the makers, sureties, and endorsers hereby guarantee the payment of this note at maturity, or any time thereafter to which extension may be granted by the holder, waiving protest and notice of non-payment.     (Signed)
     (pp. 191-192.)     E. B. GREEN."

The record in this case shows that the original complaint herein asking for the appointment of a receiver, an accounting and an injunction against L. DeSteiguer, president, and all of the directors of the National Bank of Guthrie, was filed in the court below by Theo. G. Risley, clerk, on May 11, 1892; that a supplemental complaint was filed in said court on June 6, 1892, and that the separate answers of L. DeSteiguer and the National Bank of Guthrie were both filed, either on June 6, 1892, or June 13, 1892, as shown by the following endorsements found on the back of each of said answers. "Filed June 6—92, T. G. Risley, clerk. S. K. Van-Vorhees, deputy," (which is crossed out) and "Filed June 13—92, T. G. Risley, clerk." As stated in the original opinion, each of these answers is signed by Harper S. Cunningham, attorney for defendant, with a line drawn through the name of Harper S. Cunningham, and Charles A. Berger written over this line and the name Harper S. Cunningham in the separate answer of Louis DeSteiguer, and written under said name and line in the answer for the National Bank of Guthrie. Endorsed on the back of each of said answers underneath the filing marks and oth-

13—

er endorsements thereon is the following: "Harper S. Cunningham, attorney for defendant," which said name of Harper S. Cunningham is not erased or crossed out in any way, and, as shown by the record and evidence in the case, the words "Harper S. Cunningham, attorney for defendant," was in each instance written by himself.

In both the original and supplemental complaints charges of a very serious character are made against DeSteiguer, such as the following: "That said DeSteiguer has misapplied, squandered and embezzled large sums of money, the property and assets of said defendant bank, and loaned large sums of money to himself and relatives on worthless notes and securities. That said L. DeSteiguer is wholly insolvent, and so represents himself to be." (r. p. 13.)

"The said L. DeSteiguer has taken out of said defendant bank large sums of money, the money of said defendant bank, on ficticious and worthless paper and securities, and unloaded worthless securities upon said bank, the exact amount of which is to plaintiff unknown."

"The said L. DeSteiguer has squandered, made away with and appropriated to his own use unlawfully more than forty thousand dollars of the assets, moneys and properties of said defendant bank, in fraud of this plaintiff and other stockholders of said defendant bank." (r. p. 15.)

"Plaintiffs further allege that the action and conduct of said L. DeSteiguer, toward the *bona fide* owners of the stock of the National Bank of Guthrie, was that of a bandit and highwayman, as shown by the deliberately planned scheme, to plunder and rob them by calling on them for $15,000 more, in way of assessments, to be placed in his hands, and to be stolen, as he has already stolen, large sums from the shareholders of said National Bank." (r. p. 25.)

The undisputed evidence clearly shown that the appli-
cation for the appointment of a receiver, to take charge
of the assets of the said National Bank of Guthrie, con-
tained in the original and supplemental complaints, was
repeatedly presented to Judge E. B. Green before the ap-
pointment of Harper S. Cunningham as such receiver on
June 13, 1892, and that he (Judge Green) had full
knowledge of the charges contained in said pleadings
for at least several days before such appointment was
made.

Do the foregoing facts show that Judge Green's rela-
tions with defendants, DeSteiguer and the National Bank
of Guthrie, considered in connection with his knowledge
of the manner in which DeSteiguer had been managing
the affairs of said bank, were such as to render him an
interested party in the administration of the trust estate
at the time said receiver was appointed and at all times
subsequent thereto? This question, I think, must be
answered in the affirmative. The evidence relative to
the $500 loan and the $1,610 note necessarily shows one
of the two following situations, to-wit: First, that on
June 14, or 15, 1892, Judge Green owed the National
Bank of Guthrie one thousand, one hundred and ten dol-
lars, and then procured through the receiver and DeStei-
guer an additional loan of $500 out of the cash belonging
to the bank, giving a promissory note for both amounts,
and dating same back to May 11, 1892; or, second,
that on May 11, 1892, Judge Green borrowed of said
bank one thousand, six hundred and ten dollars, giving
his promissory note therefor, and then on June 14, or
15, through the party whom he had a day or two before
appointed receiver of the bank, obtained an additional
loan of $500 from DeSteiguer who, in fact, took the

money from the funds of the bank; but, under this view, whether or not Judge Green knew at the time just where the money came from is uncertain. It is almost certain that the former statement of the situation is the correct one but, even under the latter, I am clearly of the opinion that Judge Green was not a proper person to act as the presiding judge in the administration of the trust estate. Under the former he had, in addition to being a debtor of the estate, knowingly borrowed its funds through the instrumentality of the receiver whom he had appointed to take charge thereof, and, to cover up the transaction, had dated the note given for the amount of said loan back to May 11. Under the latter, he was a large debtor of the estate at the time of making the appointment and shortly thereafter, and before the receiver so appointed had obtained possession of any of the assets, became a borrower of the person who, as its president, had wrecked the institution whose assets were thus to be placed in *custodia legis*, without ascertaining from what source the money so borrowed had been procured, and with full knowledge that such president was also a defendant in the very action wherein the receiver had been appointed. But, if this last loan of $500 to Judge Green was a personal one from DeSteiguer to him, what became of the note given by Judge Green threfor, and why did not Judge Green call DeSteiguer to account when he ascertained, even though a long time afterwards, that said money had been procured from the assets of the bank, which had already been placed in the hands of a receiver prior to the making of the loan? Or, in any event, why did he not inform the receiver of the fact that the last $500 loan was a personal one from DeSteiguer when he was being pressed, "in season and out of season," for the pay-

ment of the $1,610 note, upon the theory that it contained the said $500 loan and, as the receiver says, to avoid the detriment which he claims to have informed Judge Green would result to "everybody connected with the institution?" As before stated, it is almost absolutely certain that the $1,610 note included this $500 loan, and that said note was dated back from June 14 or 15 to May 11.

It has been suggested, both in the application for a rehearing and the dissenting opinion filed herein, that Judge Green's former exalted position as a member of this court should secure to him immunity from adverse criticism by said court except upon the clearest and most convincing proof. The unmistakable inference to be drawn from the arguments made upon this point is that, while the evidence contained in the record before us may disclose conduct on the part of Judge Green which would probably warrant our condemnation, if committed by another, yet he should be protected from such criticism because of his having been the former chief justice of the court, whose duty it now becomes to give a judicial opinion upon the facts thus disclosed by said record. To these arguments and suggestions I can, in no degree, assent. The law, in theory at least, is no respecter of persons, and it should be made absolutely so in practice. Under a proper adminstraton of the law, actions which are reprehensible when committed by the humblest citizen in the land are equally so when committed by the most exalted and influential.

The judge of a court, when required by official duty to pass upon the conduct of an individual, has no more right to take into consideration the station in life, socially, officially or otherwise, occupied by such person, than he would have to look outside of the evidence produced upon

the trial for facts upon which to determine a case submitted to him for decision. When otherwise administered than impartially, upon all classes alike, the law becomes a menace and an instrument of oppression to the people subject thereto rather than a safeguard and protection to them in the enjoyment of their sacred rights of life, liberty and property.

In this case, however, I think the proof is clear and convincing that the estate in controversy has been wholly mismanaged and a large portion thereof recklessly squandered, and that both Judge Green and the receiver sustained such relations to the trust estate and to L. DeSteiguer, the president of the insolvent bank, at the time of the commencement of this action, the appointment of the receiver, and at all times subsequent thereto, as to render both of them improper persons to manage and supervise the administration and distribution of said estate; yet, notwithstanding these facts, the duty now imposed upon me, in the case at bar, of stating the facts precisely as I find them to be disclosed by the record, and of declaring what I honestly believe to be the principles of law applicable thereto, is a most unpleasant one, more especially so, because of the cordial relations heretofore existing between the writer and the parties directly responsible for the mismanagement of the said trust estate.

Counsel for plaintiff in error, in the eighth assignment of his original application for a rehearing, says: "The trial court held there was a conspiracy between Judge Green, Receiver Cunningham and Attorney Wisby, and it was upon that theory that the trial court rendered the judgment and decision against plaintiff in error; but the reviewing court did not consider nor decide that

question, whereas it is decisive of the case one way or the other, but this court entirely overlooked the same, which we submit was error and ground for a rehearing and reconsideration." And in his amendment to application for a rehearing, he says: "Now we respectfully submit that the qualifications of Judge Green and the conduct of Cunningham and Wisby in relation to the appointment of a receiver, were not issues in the hearing upon the receiver's accounts, and for that reason ought not to be taken into consideration."

These two positions are entirely inconsistent with each other and neither, in my opinion, is a correct expression of the law applicable to the facts presented in this case.

In the sixth assignment of error contained in the original application for a rehearing, counsel also says: "The court says that the original case began in illegality; that the judge was disqualified to act. Now while we respectfully beg leave to differ with the court on this proposition, we again submit that upon such a finding and such a conclusion that the plaintiff in error, as receiver, cannot be held to account in this action, but could only be held to account in a proper action brought by the beneficiaries of the trust estate."

This position is, in my judgment, also untenable. Although it is decided in the majority opinion of this court that Judge Green was interested to such an extent as not to be a proper person to act as presiding judge in the administration of the trust estate, yet it does not follow from this holding that all of his acts in relation thereto are void, or even voidable, in so far as to believe the receiver, who procured his own appointment from said court, from any liability, either personally or upon his official bond, for the faithful performance of the duties

assumed. Under the contention of counsel, a person could procure his own appointment as receiver of an insolvent institution from an interested court and thereby obtain possession of all the assets pertaining thereto and misappropriate and squander same before the stockholders or creditors of such institution who were adverse to the appointment of the receiver could procure his removal, and then defend against any liability upon his official bond for the misappropriation of said assets on the ground that the court who appointed him was an interested party and, therefore, disqualified to act. Such a position is wholly at variance with the entire policy of the law relative to the closing up of insolvent estates and the distribution of the assets derived therefrom.

In this case it was earnestly contended by counsel for plaintiff in error, both in his brief and oral argument, that, inasmuch as all, or nearly all, of the expenditures of the receiver were shown by the evidence, including the affidavit of Judge Green, to have been made upon the verbal direction, advise or acquiescence of Judge Green while in office, and that this verbal direction and advise were equivalent to orders approving such expenditures and that, therefore, the adverse parties herein are estopped from excepting to said expenditures or, in any manner, showing that they were extravagant or unnecessary. It was in answer to this contention that this court, in its original opinion, and the trial court, in its oral opinion, declared Judge Green to be an interested party, and that such oral orders and directions would not be considered binding. Under the contention of counsel upon this proposition, it would make practically no difference whether an expenditure made by a receiver out of the trust estate was at all necessary, reasonable or proper,

just so he could procure even a verbal order of the court appointing him approving such expenditure. Under said contention, had Judge Green allowed the receiver in the case at bar one thousand dollars per month instead of two hundred and fifty as compensation for his personal services in looking after the affairs of the estate, such allowance could never thereafter be questioned or set aside. In my opinion, counsel's entire position upon this point is wrong. I think that, even though a trial court should, by written order, approve an unnecessary and unreasonable expenditure made by a receiver out of a trust estate, this court would not only be justified, but in duty bound, to set aside such order and disallow the expenditure, and this notwithstanding the fact that the judge of the trial court making such order may have been a wholly disinterested person and otherwise entirely qualified to act in the premises.

One of the largest items of disallowance complained of by plaintiff in error is the reduction of his salary after the first six months, from $250.00 a month, the amount which the evidence shows Judge Green verbally agreed to allow him, first to $125 per month and later to $50 per month. It is urged that, as the evidence on behalf of the receiver shows that his business as a practicing attorney at the time of accepting the receivership amounted to $4,000 per annum, and as it required the greater portion of his time to look after the affairs of the estate which is the subject of this litigation, he should have been allowed at least the sum of $250 per month as compensation for the time and labor thus expended. I am convinced that the rule contended for by the receiver's counsel is not the correct one to be applied in determining the amount of compensation which should be allowed

a receiver, or other persons entrusted with the settlement and distribution of an insolvent estate. Unquestionably the proper rule to be applied in such cases is to allow the receiver adequate compensation for the amount and character of the services performed by him for the estate. Because a person's services as an attorney at law are such as to command a practice of $4,000 per annum, it does not necessarily follow that his services as the receiver of an insolvent bank, or of a mercantile or other insolvent establishment, would be worth an equal amount, or even one-half that amount.

The rule by which the compensation of a receiver, in such cases as the one at bar, should be determined is well and concisely stated in *French v. Gifford*, 31 Ia. 428, wherein it is held:

"Two questions are presented for our determination, namely: What sum should be allowed the receiver for his services, and against which party ought they to be adjudged.

"On the first question we have, after a careful consideration of all the circumstances of the case, come to the conclusion that the amount of compensation allowed the receiver by the referee is too great. While we concede that the receiver should receive a compensation corresponding to the high degree of business capacity, integrity and responsibility required in cases of this character, and which was secured in the person of the receiver in this case, yet we feel it our duty to allow only such sum as will be such reasonable compensation.

"There can be no reasonable grounds to doubt that the receiver in this case, or some other person possessing equal qualifications, could have been employed by private contract to perform the services rendered in this case for half the amount allowed by the referee. This, it seems to us, is the fair and reasonable test by which the amount of compensation to be allowed should be determined. While

it may be true that an individual of the required quali-
fications, if engaged in a lucrative private business, could
not be induced to abandon such business for a temporary
appointment of this character without extraordinary
compensation, yet one of wealth and leisure may readily
be found (as in this case), who would undertake the trust
for a reasonable and ordinary compensation. We would
not be warranted in allowing extraordinary compensa-
tion unless in a case of imperative necessity."

I shall now quote from the testimony of the receiver
himself relating to his qualifications to perform the duties
required of him and the amount and character of the
services performed in the management of the trust estate,
to ascertain whether or not the allowance made by the
trial court is adequate compensation for such services:

"Question. Did you make any inspection or examina-
tion to ascertain whether or not you received the assets
that were represented on the books? Answer. No, sir, I
did not, because I could not understand it myself and Mr.
DeSteiguer and Turner said that they balanced the
books.

"Q. You simply took DeSteiguer and Turner's state-
ments then as to the condition of the books and of the
bank assets? A. Yes, sir, I took what they gave me and
that is all I got, is what they gave me, and I could not
find any other.

"Q. Did the fact that you found the condition existing
there that you did, that DeSteiguer had borrowed this
amount of money on fictitious paper arouse any sus-
picion that would require you to make an examination
of the affairs of the bank? A. There was no concealment
about that, that was a matter that was discussed before
the receiver was appointed." (p. 132.)

"Q. Now at the time the bank went into the hands of
a receiver, Thwing, DeSteiguer and Turner all claimed to

have, like yourself, contracts running from some time in January, 1892, until the end of the year, did they not? A. I don't think they did.

"Q. At that time, at the time of the suspension, Turner and Thwing took out assets of the bank and paid themselves for their full year, did they not? A. I don't know.

"Q. Don't the books show? A. I don't know.

"Q. Have you never looked at them to see? Q. Yes, I do know.

"Q. Have you never looked at the books to see? A. I had no contract running for a year, Mr. Thwing wasn't in the employ of the bank at the time mentioned. Mr. Turner was employed as cashier but I do not know how much money was gotten—I don't know what his contract was, nor do I know what amount of money, from an inspection of the books, was paid to him. I have heard that he was paid for the current year, ending January 1, but I do not know.

"Q. January 1, 1893? A. Yes, sir.

"Q. Don't the books so show? A. I do not know— never looked to see; if I did, I didn't so understand it. I did not go over the books as a bookkeeper, because I didn't understand it.

"Q. And did not the books also show that DeSteiguer took about $1,700 out about that time? A. I do not know." (pp. 139-140.) * *

"Q I will ask you if, in your examination before Major Chalmers, this question in regard to the books was not asked you and to which you made this answer: 'Question. Did the books of the bank show anything of this transaction of Judge Green's note indebtedness to the bank?' To which you answered: 'The books of the bank are in my possession, but they are so peculiarly kept and so complicated that I, with my limited experience as a bookkeeper, am obliged to say that I cannot tell anything about them, and I have never really tried, for what ex-

amination I have given them shows that they are too complicated for me to comprehend?' A. I think that is exactly the fact though I do not remember answering it to Major Chalmers that way.

"Q. So that you have never attempted to comprehend or have those books examined? A. That is correct, I could not comprehend them and I did not try.

"Q. Was not then this question asked you, to which you made this answer: 'Question. Is there anything in the books showing that Judge Green is debtor to the bank?' To which you answered: 'Nothing that I know of. I think that the evidence of the transaction, under their system of book keeping, was limited to the existence of the note, which was charged to an account in the books which they called 'loans'; and from that account I apprehend that it would not be possible without any knowledge of the facts to identify the transaction on the books.' A. Well, that is my opinion now." (pp. 142 143.) * *

"Q. I will ask you to look at this book and state whether that is not the cash book of the bank that was current at that time? A. Well sir, I would think that was Mr. Turner's hand writing.

"Q. Is that not the cash book? A. Well, I could not state.

"Q. You do not know what the books of the bank were? A. No, sir, that is what this book shows, that it is a cash record, and I should think it is in Mr. Turner's hand writing, and my best opinion would be that that was one of the books of the bank.

"Q. And you now state that you do not know what the books of the bank are? A. No, sir, I don't. The only thing that I know about what the books of the bank are is just this: There was a large number of books turned over to me as the receiver. I had Mr. Turner who was cashier of the bank employed, and whenever we wanted to know anything about the books, Mr. Turner always went and looked at them, and he was able to tell, but I

was never able to master a thing, or know how they were kept, and I never tried it, because I was no book keeper and knew that I never could master it and I knew that there was no necessity for it, for if a cause arose for the use of the books in any way, Mr. Turner looked it up and we adjusted it that way." (pp. 168-169.)   *   *

"Q. Can you state what labor was taken, after the first six months had expired in collecting the assets of the bank, other than collecting the rents? A. Well, there was a good many things that were done. I had constant work looking after things that turned out to be profitless; and a great many law suits on hand, I looked after a good many of them.

"Q. What proportion of your time was consumed in looking after the trust during the early part of your work? A. Practically all of it at first; so much so that my business that I had, which was a very good business at that time, for instance, that which I was doing in the land office, I turned over to other people, and all the justice of the peace business, or a little business that came to me, I turned away, and practically I devoted my time to the taking care of this estate. After that, the fact that I had taken up this business and the fact that I had been villified, and accused of robbery and thievery, and all this kind of thing, and the motions made to re-move me, and harassed and annoyed constantly during all the time, finally indicted for the purpose of having me removed, and all these things, just practically took away my business. This last year and a half I haven't had any business to speak of, and the result has been very disastrous to me, so far as my financial prosepect is concerned.

"Q. You were appointed in June, 1892, I believe? A. Yes, sir, June 13, 1892.

"Q. During the summer of 1892, was all of your time consumed with the business of the bank? A. Well, it was practically all the business that I did. I had a few cases in court that I have always attended to.

"Q. Did you personally attend to the business of the bank, or did Mr. Turner do it. A. Mr. Turner and I both were looking after the business the same as he was, but I had to have somebody who understood the matter in order to get along with it at all, I thought.

"Q. Was all of his time consumed during the time that you had him employed? A. Yes, sir, he didn't do anything else.

"Q. During that time he made the collections that were made, did he? A. A good many of them, yes, sir.

"Q. Kept the books? A. Yes, sir, kept the books up to the time that he left.

"Q. You paid him $100 a month? A. Yes, sir.

"Q. During the entire time? A. No, sir, the first twelve months.

"Q. Then how much longer did you keep him? A. Four months.

"Q. You paid him $50 a month for the four months? A. Yes, sir, I paid him until the time I made this report —I was hurried for that.

"Q. After the first year what was there for you to look after except the property and rents and the collections and the law suits? A. I had some amount of notes which I had been collecting all the time.

"Q. Did you have attorneys employed for all the litigation you had? A. I had Mr. Wisby employed, and since that off and on I have had Judge Green's services in several cases, special matters, but I had Mr. Wisby employed and he continued to work for me and do what there was to do until the time of my September 20 report.

"Q. You were a practicing lawyer also at the time? A. Yes, sir.

"Q. You had this bank business in your law office? A. Yes, sir.

"Q. And you continued to do your law business in the district and supreme court? A. Yes, sir, in the district and supreme court I did.

"Q. You were elected to the legislature during that time? A. Yes, sir.

"Q. When were you elected? A. I was elected in the fall of 1892, and served sixty days.

"Q. During the year 1893? A. Yes, sir.

"Q. During that time who attended to the business of the bank, or did it require any? A. I attended to it, what was done, that is, I superintended it. Mr. Turner was in the office every day, and when anything occurred that had to be done, I attended to it.

"Q. During 1893, what proportion of your time was required by the interests of the trust to the business? A. Well, I could not state the exact proportion, but it was spasmodic. It had to be attended to whenever the time would have it, so I could not tell just what actual time I devoted to the interests of the trust, but I attended to whatever came up.

"Q. During the year 1894, what proportion of your time was occupied with the business of the trust? A. Well, not near so much as there was the other two years, nor I would not be able to state the proportion.

"Q. Did it require one fourth of it? A. Yes, sir, I think more than that, perhaps it did require when it needed to be attended to—I could not tell as to the amount." (pp. 127 to 130.) * *

By the court: "When you took possession of the bank on the 16th, who turned it over to you? A. Mr. DeSteiguer.

"Q. Who had been the cashier of the bank? A. Mr. Turner.

"Q. That was the same person you employed as book keeper? A. Yes sir.

"Q. Was he the same Turner that had the thousand dollar note in there? A. Yes, sir.

"Q. The DeSteiguer note you found in there for how much, ten or twelve thousand dollars? A. No, sir, three thousand dollars.

"Q. Was there not another note for ten thousand dollars among the assets? A. Yes sir.

"Q. Whose was that? A. Thwing's.

"Q. Was he a relative of DeSteiguer? A. An employe, a former employe in the bank; he wasn't employed when I took charge.

"Q. What relation had he borne to the bank? A. He had been a clerk in the bank.

"Q. He had been a clerk? A. Yes, sir.

"Q. Did you ascertain from the books or from other sources at your command, who got the ten thousand dollars that Turner borrowed? A. No, sir; only what was told me afterwards, that it was an accommodation note of DeSteiguer.

"Q. Was the Thwing note the same? A. I so understood it afterwards." (pp. 130-131.)   *   *

"Q. Now you say that your services, you thought were worth about ten thousand dollars for thirty-three months? A. Yes sir.

"Q. That is at the rate of a little over $300 a month? A. That is about right.

"Q. For thirty-one months you didn't collect that much, did you? A. No sir." (p. 215.)   *   *

"Q. Now do you mean to say that the United States National bank has put its note into the National Bank of Guthrie and has not paid for its stock? A. No sir, but I mean to say that I beileve that DeSteiguer had not paid for the stock that he hypothecated with the United States National bank.

"Q. But the money of the United States National bank, $30,000 of it, went into the safe of the National Bank of Guthrie? A. No, sir; went to DeSteiguer personally as I understand it.

"Q. Do the books show it that way? A. No, sir; I don't know anything about what the books show.

"Q. Have you looked at the books? A. No, sir, never have.

"Q. Who told you that it went in any such fashion? A. It has crept out all along the line.

"Q. Who told you anything of that sort? A. I think Mr. DeSteiguer told me about that.

"Q. You did not look to see whether that money went to the National Bank of Guthrie? A. I understood that it did not.

"Q. You never looked to see? A. No, sir, I never looked." (p. 94.)    *    *

"Q. On March 13, 1895, you charged the expenses of DeSteiguer for several trips made here for the benefit of the receiver,$485.50? A. Yes, sir.

"Q. When were the trips made? A. They were trips when I called him here by direction of the court.

"Q. What court? A. Judge Green. I paid a portion of these in cash, that is, I honored his draft at one time— I needed him here on some one of the cases and telegraphed him to come and he wired back that he would come if the exepenses were paid.

"Q. Have you a copy of that telegram? A. Yes, sir; I have the telegram which I sent him, it was attached to the draft and he came in person." (p. 162.)   *   *·

"Q. The draft that you see here with the telegram in May, 1893, is for $100. A. Yes, sir.

"Q. What other drafts did you send to DeSteiguer? A. I did not send any other.

"Q. What is the date of that draft? A. It is May 11, 1893. He just wouldn't come at that time unless I put up. The rest of the times he came and paid his own expenses, but he always insisted that I would have to reimburse him for them, and when I had a partial settlement with him before he left here the last time, he made out his account and insisted on my giving him credit for it and I did so. I had performed a great many services for him in regard to his civil business here during the last three years, and we have an unadjusted account, but the $385, the difference between the $485 and the draft which I had paid, and some money which I had given him, I

don't just remember the amount now, but it occurs to me that it was $40, and was allowed by me on my claim against him for services.

"Q. When was that settlement made? A. That was made just before he left here the last time, on the 15th of March, 1895. I caused him to make out a verified claim of the items, and verify it, and that verification is on the 15th of March, 1895, I see.

"Q. You settled with DeSteiguer then in that matter just by allowing him what he claimed as expenses, and then he allowed you to retain that for what fees he owed you; is that right, so that no money passed between you? A. Nothing but the $100 and the $40—I think it was $40.

"Q. What trips were there that DeSteiguer made upon this occasion? A. They were trips that I caused him to make.

"Q. What times were they? A. Well, the times that I have mentioned in my report.

"Q. What report other than this? A. No times except as this item here indicates the times. He has made out the dates here that he came and when he made the expense. The first one was September 23, 1892, trip from Chicago to Kansas City." (pp. 163 to 165.) * *

"Q. Before you made this compromise with DeSteiguer, you knew that DeSteiguer had taken $500 out of the assets of the bank, and turned it over to Judge Green, did you? A. I suppose I did.

"Q. Why didn't you then refuse to make this compromise with him, and require that that should be set off against the moneys that he had taken out of the bank after the receiver was appointed? A. Well, this was the matter that came in the setlement with myself.

"Q. You did that in order to save it to yourself? A. Yes, sir.

"Q. Now then you preferred to leave the other account unadjusted? A. I preferred to leave the Green account just as I found it; I couldn't collect it from Judge Green, or if I could—if it could be collected from Judge Green,

it would be done by me in the future, because Judge Green always said he would pay it, and he was paying it some by services and probably would pay the balance of it. This was a matter that I was adjusting of my own.

"Q. Now then, on the 13th of March, you charged for the amount paid for stock of A. Guthrie, 30 shares, $750. When did you pay that amount? A. I paid it to DeSteiguer.

"Q. When? A. I don't remember the date.

"Q. How much stock did A. Guthrie have at that time? A. $3,000 worth.

"Q. You were paying then twenty-five cents on the dollar for that stock? A. Yes, sir; paid twenty-five cents on the dollar.

"Q. You had no order of court for that? A. No, sir.

"Q. Why did you not take the order of the court, or ask the consent of the court before making a payment of cash for that stock? A. I didn't have any special reason.

"Q. Was that payment to DeSteiguer of $750 between the 23rd of August, 1894, and the date indicated here on this exhibit, March 13, 1895? A. No, sir; I think it was before that.

"Q. If it was before that, why did you not show that in your report of August 23, 1894? A. Because I did not report it among the assets of the bank.

"Q. Why did you not report it as part of your expenditures? A. I didn't want to.

"Q. Why didn't you report it as part of your doings as receiver? A. I didn't want to.

"Q. Why not? A. Just simply because I didn't want to.

"Q. What objection had you to reporting it at that time? A. I wanted to keep it.

"Q. Why did you want to keep it and not report it? A. Simply because I did.

"Q. But there must have been some accounting, some reason why you as receiver made this purchase of $3,000

worth of stock giving $750 in cash for it, and did not want to report it to the court? A. I calculated to report it at the proper time, when I made my final report.

"Q. Now will you tell the court why you didn't consider it a proper time to make that report as a current transaction? A. I had no special reason to give.

"Q. And you cannot state now why it was that you did that? A. Not exactly." (165 to 167.)

The foregoing testimony, which is only a small portion of that of a similar nature contained in the record, tells its own story; and, in my judgment, to allow a greater amount on the receiver's claim for compensation than was allowed by the trial court would not only be paying him for services never performed but would, to say the least, be rewarding incompetency and mismanagement.

Another item of disallowance by the trial court, and which was affirmed by this court, is that of $692 attorney's fee paid by the receiver to Mr. Joseph Wisby, who had been appointed by the court as the general attorney for said receiver. It is my opinion that the receiver comes more nearly having a valid reason for objecting to this disallowance than any other made, and if it were not for the fact that the testimony shows a large portion of the work done by said attorney to have been performed in resisting motions to have the receiver removed, each of which motions should, unquestionably, have been promptly sustained, this disallowance probably ought not to be approved; but, especially in view of the circumstances surrounding the appointment of Mr. Cunningham as receiver, which were known to him at the time, I do not think that he is any more entitled to charge the estate with an attorney's fee earned in resisting motions for his removal than he would be entitled to charge the

estate for the services of the attorney who represented him in the final settlement of his accounts with the court and in perfecting and prosecuting his appeal in this court from the disallowances made by the court below. Furthermore, the evidence is very indefinite and uncertain as to what, if any, services were performed by said attorney for some of the items disallowed by the trial court. The evidence of the receiver and his attorney as to said items is, in part, as follows:

"Question. After you had settled with Mr. Cunningham the Cunningham & Wisby matter, then you got Wisby to settle with Cunningham in the Cunningham matter, did you? Answer. I didn't say anything of that kind; there wasn't any such a transaction.

"Q. Well, is it not stated in here as a part of the claim of Mr. Wisby's services, including $650 from G. S. Cunningham, ten per cent on account, collected $65? A. From that it is—he didn't have anything to do with that.

"Q. Who didn't? A. Mr. Wisby.

"Q. Who did collect it then? A. I did.

"Q. You paid him then $65 for doing nothing, for something that he didn't do? A. No sir.

"Q. You say he did not do this work? A. I say this, that the claim of Mr. Cunningham of $1,205 was by me compromised, by allowance in the payment of Mr. Cunningham's notes for $504.

"Q. What did you allow Cunningham for? A. For services that he had rendered the bank long before this failure. I knew the claim that he made when the notes were first in my hands for collection, but I did not get any adjustment with him until after I was appointed receiver, and then I compromised the matter with him by direction of Judge Green for $504 endorsing that amount on his notes, that was the way it was.

"Q. He paid the balance? A. Yes sir.

"Q. Then how did you come to pay Wisby $65? A. Well, I don't know; that is a matter that I don't remember of.

"Q. I will ask you to look at it so you can refresh your memory (handing witness bill)? A. It appears that there is an item here of $65, which is included in this which I do not understand. I don't have any recollection of Mr. Wisby having anything to do with the settlement with Cunningham." (pp. 71-73.)   *   *

It is but. proper to state here that the claim presented by Mr. G. S. Cunningham designated as the Cunningham & Wisby claim is one in which Mr. Wisby at the time of the commencement of this action and at all times subsequent thereto, had no interest whatever, but had assigned same to his former partner, G. S. Cunningham, upon the dissolution of said partnership, which had occurred some considerable time before the beginning of this litigation.

"Question. You stated that that was the time the receiver was agreed upon between Mr. Wisby and yourself? A. No sir, the receiver, between Mr. Wisby and myself was not agreed upon, more than an hour just before dinner, before the appointment was made on the 13th." (p. 110.)

"Q. At the time that you and Mr. Wisby agreed upon the appointment of a receiver, you say Mr. Wisby had some proceeding hostile to the bank at that time? A. Mr. Wisby was attorney for the United States National bank in the suit to appoint the receiver.

"Q. Which brought the action to have the receiver appointed? A. Yes, sir.

"Q. You was resisting that? A. I was resisting that up to the time that I resigned.

"Q. Then at that time you entered into an agreement with him for the appointment of a receiver? A. No, sir; I resigned and turned over the attorneyship of the bank to Judge Berger, for the bank.

"Q. Who was it that made the agreement then for the appointment of the receiver? A. I was a candidate, Mr. McNeal was a candidate. I was a candidate for the appointment and the agreement for my appointment was made by me individually with Mr. Wisby.

"Q. With Mr. Wisby? A. Yes sir.

"Q. At the time that you made that agreement with him that you should be appointed receiver, did you have any stipulations or conditions to the effect that he should be the attorney for the receiver? A. Yes, sir; I think I told him if the court would consent to it, that I would employ him as attorney for the receiver.

"Q. Was there any conditions or agreement between you and Mr. Wisby or Mr. DeSteiguer that this loan was to be made to Judge Green? A. No, sir; none whatever. Mr. Wisby knew nothing about it; it was never thought of until the day after the appointment." (pp. 134-135.) * *

Testimony of Joseph Wisby:

"Question. What was the next work in that $315 item? Answer. The next work was in reference to the same matter. I was here in the supreme court two days. You was trying, or I was informed you was trying to get the supreme court to make some kind of an order on Judge Green with reference to the matter and Mr. Cunningham told me to look after that; it was liable to come up here, and he wanted me to come over and stay here, and so I came over here and remained for a couple of days in attendance upon the supreme court.

"Q. Any motion in the supreme court? A. No; the matter had been called up, so I had been informed, in the supreme court, but I don't think there was any motion.

"Q. That I had called any matter up in the supreme court?  A. Well, the judges, or one of them, informed Mr. Cunningham that you was asking him about it, and tried to get him to consent to its coming up.

"Q. Which one of the judges was that?  A. I don't know; I think it was Judge Clark—no it was not Clark, my impression is now that you had called it up, mentioned the matter to the court or some of the judges, and was going to insist on some kind of an order on Judge Green in relation to the matter, or in relation to this business.

"Q. You never saw any paper filed by me?  A. No sir, I didn't see any paper filed.

"Q. You didn't hear me make any motion?  A. No sir, I did not.

"Q. Now how do you know that I made any such statement to the court?  A. Now, I say, I am unable to tell.

"Q. Now will you state what judge gave you that information?  A. I didn't say that any judge gave me that information.

"Q. How could you have information of a fact that never was a fact?  Who gave you that information? A. Mr. Cunningham gave me the information, the facts." (pp. 231-232.)

As stated in the original opinion, the testimony shows that the receiver paid other attorneys than Mr. Wisby the sum of $150 for specific services performed by them for the trust estate.

In support of the receiver's contention that the attorney's fee paid out by him on behalf of said trust estate is not unreasonable, attention is called to the fact that the testimony shows the nominal value of the assets of the insolvent bank to have been $120,000 at the time of the appointment of the receiver, but the evidence, as given by the receiver himself, also shows that the real value of said assets at said time did not exceed the sum of $40,000,

including therein at their full value, the note of Judge Green, about $6,000 worth of provisional warrant indebtedness of the city of Guthrie, about $3,400 on deposit with the United States, of which the receiver never had possession or control, and a claim in suit against E. T. Patton & Co., for about $6,000.  (pp. 215-216.)

Another item of disallowance complained of by counsel for the receiver in his original briefs and application for a rehearing, is one for $35, charged for expenses to Kansas City to enforce the collection of a note for $312, signed by one Kenney, whose real name was Lampson.  According to the testimony of the receiver, he collected the original $312 note by obtaining $100 in cash, a new note for $212, and keeping "a very large solitaire diamond ring," which was off-colored and niched a little.  What disposition was made of the ring or of the $212 note is not disclosed, but the receiver charges himself with the full amount of the $312 note and charged the expense of the trip to Kansas City to the estate.  I think the disallowance of this item of expense entirely proper.  Had the receiver acounted for the ring and the $212 note, and shown that they were both properly disposed of, and that he did not realize therefrom sufficient to pay the amount of the original note and his expenses, then the estate should undoubtedly have been charged with said expenses, but to permit receivers to thus speculate with the assets of an estate in their hands and charge the expenses incurred in making such deals to the estate would, in my judgment, be a very dangerous precedent.

Another item of disallowance specially complained of by the receiver is the alleged expenses of a trip to St. Louis of $90.25 to consult with Judge Green, who was

away on his annual vacation. A portion of the testimony of the receiver relative to this expenditure is as follows:

"Question. On the 26th of July, 1892, is an item of expenses of a trip to St. Louis to consult Judge Green, amount $90.25? Answer. Yes sir.

"Q. What was necessary for you to do on that trip that you could not do by correspondence? A. Among the assets of the bank, when I took charge of it, I found the note of J. E. Turner for $10,000, one of Ed. Randall for $5,000, and one of F. H. Thwing of $10,000, and one of Louis DeSteiguer for $3,000, * * and a note of the Guthrie Lumber company for $4,500, and an overdraft of the Guthrie Lumber company for $1,064.08; they were all really debts, as I afterwards ascertained, of Louis De-Steiguer.

"Q. At what date were those turned over to you? A. A portion of them on the 16th of June, and a portion of them on the 5th of July; and after I commenced to prospect on the probable value of these assets, Mr. De-Steiguer informed me that he was really the one who was primarily liable for those debts, and he said that he wanted to take them up, and the first talk that we had about it was with reference to the lumber company. I had the lumber company's note for $4,500, and a chattel mortgage on the lumber yard down here. Well, I dickered with him about that and finally bought the lumber yard of him, without foreclosing the mortgage, and gave him credit on his note for $2,500. And then he said that he would like to trade me some stock in the institution that he had for J. E. Turner's note, and the balance of the Guthrie Lumber company debt, and he made me an offer of the stock at about par value for this property; I said that I don't know that I have authority to deal in the stock of the institution; well he said, I owe this and I want to pay it; I am really primarily liable for this and I want to pay it, if I can, but I am so embarrassed that I cannot pay cash, but I will give you this stock for these

claims, these notes. I said I cannot do it, I cannot make the deal with you. Then he said, if you do not deal with me, I shall place this stock in payment of my other liabilities so that your only chance to collect these notes will be gone; Turner is insolvent, barring this stock, and unless you take this stock, why your chances to collect these notes are very slim. * * Had I not made that trip to St. Louis, I believe that I never could have dealt with DeSteiguer for that stock, or any other stock. I afterwards dealt with him for the balance of it on his debt that I have named here, in stock at nearly the par value of it. * * When I found Judge Green and explained the situation to him, he approved of my action, and directed a transfer of the property.

"Q. Why could you not have written that to Judge Green just as well as giving it to him by word of mouth? A. Well, a man cannot write circumstances, delicate ones like that and have them understood.

"Q. Was there anything necessary to write except what you have stated? A. No, there was not anything; it was not necessary to do more than present the situation to Judge Green's mind, and I deemed it important enough to do it in this way.

"Q. He had not ordered you to make that trip, had he? A. Not in advance. No sir.

"Q. Now then, what was your expenses on that trip to St. Louis, what was your car fare from here to St. Louis and return? A. I don't remember.

"Q. About how much? A. Well, it is about—I can only testify, if I testify at all, approximately, that is about the distance, etc., I don't recollect how much it was.

"Q. About how much is it? A. I don't know; it seems to me it is $7.50 from Kansas City, that would make $17.15 I expect, but I have not figured it.

"Q. That would make your car fare to St. Louis and return $34.30? A. Yes, sir.

"Q. How many days were you in St. Louis?   A. I was in St. Louis three days.

"Q. Your hotel bill at $5.00 per day would have made that then $49.30—where did the other $40.00 come in? A. I think about $8.00 of that was for sleeper.

"Q. What else?   A. And fees to the porter would be another dollar.

"Q. How much more?   A. And I paid Judge Green's expenses from Mt. Carmel to St. Louis and return.

"Q. What time did you do that?   A. Then and there.

"Q. This does not indicate it, does it?   A. Well, it is in my bill.

"Q. Where is your bill?   A. Whatever that $90 is.

"Q. Where is your bill in which you charge that? A. It is in that $90.

"Q. This statement, then, of your expenses of trip to St. Louis to consult Judge Green is incorrect in this, that you have also paid Judge Green's bill and this item does not show that?   It does not indicate that?   A. I don't think it does.

"Q. Why didn't you make the statement to show that it covered the expenses .of both yourself and Judge Green?   A. I didn't think it was necessary.

"Q. How much did you pay Judge Green?   A. I don't remember.

"Q. You took no receipt from him?   A. Certainly not.

"Q. You have no idea how much you gave him?   A. No, I do not remember; it was what his necessary expenses there from Mt. Carmel and back and what his hotel bill was." (pp. 21 to 25.)

The justness of disallowing the above item seems to me to be too apparent, according to the testimony of the receiver himself, to need further comment here.

In the receiver's testimony is also found the following:

"Question. Now then, the fact, then, is that you made that trip, if you went before the 5th of July, primarily for the purpose of keeping out of the way of the officer

of the comptroller of the currency, is it not? Answer. No, sir, I made the trip for this purpose, I went there primarily for the purpose of collecting this debt, but if I went before the 5th of July, I then just simply staid away, because I did not want to get into a row with you here before the court, until after the meeting of the stockholders.

"Q. At that time you had already been appointed receiver of the bank's assets, had you? A. Yes, sir.

"Q. Do you mean to tell the court that at that time you went away before you had received possession of all the assets—before you took physical possession of all the assets of which you had a commission to take possession, rather than to meet the comptroller's officer? A. I took possession of the bank building and the safe and all its contents and all assets that were in sight.

"Q. On what date? A. On the 16th of June. But there were a good many assets that were afterwards turned over to me that were not in sight at that time; that is, that were not accessible to me, and not turned over to me.

"Q. Did you look for them in the bank safe vault? A. They were not in the bank.

"Q. Did you look for them in the bank safe and in the vault? A. Yes, sir; I looked in the bank safe and in the vault, but I did not look for more assets, I was not hunting more assets.

"Q. You knew that they were not turned over to you? A. I was informed that there were more assets which would be turned over to me.

"Q. Why didn't you have the process of the court to get them turned over to you? A. I thought I could get them in an easier way." · (pp. 13-14.)    *    *

"Q. On the 12th of June, 1892, is an item of trust, telegraphing, $7.75. To whom was that telegraphing done, and by whom? A. That was done by Mr. Wisby

to me, and myself to Mr. Wisby, and Mr. Turner while you were threatening to break into the safe and all this kind of thing while I was absent.

"Q. Did you pay that telegraphing bill?  A. I did sir.

"Q. You paid for Mr. Wisby's telegrams to you?  A. Yes sir.

"Q. You paid for Mr. Turner's telegrams to you?  A. Yes, sir, I paid the whole bill.

"Q. And that arose because an officer of the comptroller of the currency was here claiming the right to examine the assets of the bank?  A. Yes, sir; that arose because I was not here to meet your demands.

"Q. You had left here to avoid meeting them, had you? A. Yes, sir; I was away to avoid meeting them. I want to remark here that I was away to avoid meeting them, too, after having discussed the question somewhat with the court."

In addition to the testimony of the receiver, Mr. Wisby and Judge Green, both Edgar W. Jones and C. G. Hornor testified upon the trial of the case below, Mr. Jones having been called for the exceptors and Mr. Hornor for the receiver, (See testimony, pp. 53-241,) but as the testimony of neither of these parties is very material to any of the issues now involved, I do not deem it necessary to quote any of same or comment thereon.

The action of the trial court is disallowing all of the other items complained of by the receiver is equally well, and in some instances better, justified by the evidence of the receiver himself as any of those hereinbefore specifically noticed.  Counsel for the receiver argues that, as there was no evidence produced by the exceptors to show that the receiver's final report was incorrect, or that any of the items of expense therein contained was extravagant or unnecessary, the report should, therefore, have been approved.  This contention is certainly incorrect.  The

burden was upon the receiver to show the correctness of his accounts, though no specific exceptions had been made thereto. It was the duty of the court below to carefully scrutinize all of the expenditures made by the receiver, even in the absence of such exceptions, and to disallow such charges as were unreasonable, improper or unnecessary.

According to my understanding of the matter, trial courts should require receivers appointed by them to give strict accounts of the assets placed in their hands rather than to assist such receivers in recklessly squandering and dissipating such estates.

In the original majority opinion of this court I, together with Justice Bierer, contented myself with concurring simply in the conclusions reached, based upon the general finding of the court below. I still think that conclusion correct, and, as no cross errors are assigned by defendants in error, none of the rulings of the trial court in making allowances to the receiver for compensation and expenses in the administration of the estate involved can now be considered by this court, but I am convinced that, under the evidence, we should wholly disallow the claim of Receiver Cunningham for $997.35, for the $1,000 of provisional city warrants, and that the present receiver should be directed to turn said warrants back to Mr. Cunningham.*

It is so ordered, and the petition for rehearing denied.

---

*Note.—At the January, 1898, term, hearing was had on motion to vacate judgment rendered. Motion was denied. Upon full consideration of the matters and things involved in said motion, the court modifies the said judgment to the extent of allowing the appellant, Harper S. Cunningham, to present his claim for attorney fees as mentioned in said judgment, and his claim for the one thousand dollars on account of the city warrants mentioned in said judgment, to the receiver of the National Bank of Guthrie.                    [REPORTER.]